FILED

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

97 JAN -8 PM 3: 19

U.S. DISTRICT COURT
N.D. OF ALABAMA

**SARAH SALTERS, et al.,**                    ]
                                              ]
    Plaintiff(s),                       ]
                                              ]
    vs.                                 ]   CV-95-N-2015-NE
                                              ]
**CITY OF HUNTSVILLE, et al.,**               ]
                                              ]
    Defendant(s).                       ]
                                              ]

ENTERED

JAN 8 1997

## Memorandum of Opinion

## I.    Introduction

Sarah Salters, individually and as the personal representative of the estate of Johnny

Hoyt Salters, brings this civil action pursuant to the authority of 42 U.S.C. § 1983 and the

laws of the State of Alabama. Ms. Salters alleges that the defendants, the City of Huntsville,

Alabama, and Ric Ottman, its police chief, violated Mr. Salters' rights to due process and

to be free of unreasonable searches and seizures under the Fourth, Fifth, and Fourteenth

Amendments to the United States Constitution. She also brings claims under state law for

the wrongful death of her decedent and for loss of consortium. The claims arise out of the

shooting death of Johnny Hoyt Salters by officers of the City of Huntsville Police

Department.

The defendants have moved for summary judgment as to all claims. For the reasons

stated herein the motion will be granted as to claims brought under 42 U.S.C. § 1983. The

*39*

remaining claims, all brought under state law, will be dismissed pursuant to the provisions of 28 U.S.C. § 1367(c).[1]

## II.  Undisputed Facts

On May 20, 1994, Sarah Salters returned home from running errands to find her husband, Johnny Hoyt Salters, sitting on the patio of their home with a nine millimeter handgun in his lap. Mr. Salters was subject to regular bouts of depression due primarily from pain he suffered as a result of a back injury, a heart attack, and cardiac surgery. When Mrs. Salters found him, Mr. Salters was crying, depressed, and threatening suicide. Mrs. Salters unsuccessfully attempted to talk to her husband but was rebuffed. When Sonja Horner, the daughter of Mr. and Mrs. Salters, tried to talk to him, Mr. Salters pointed the gun at her and told her to go back into the house with her mother.  Mrs. Salters telephoned the Huntsville Police and told them that her husband was armed and threatening to kill himself, and that he had threatened to shoot if the police came to his home.

A number of officers were dispatched to the Salterses' home. The first to arrive were Terry Wise, Charity Roe, Penelope Vines, Pat Trussell, and Phil Crane. When Mrs. Salters left the house to meet with the officers, Mr. Salters came out of the house and stood on the front porch with his gun.  Irate and cursing, he demanded that the officers leave. When they asked him to put his gun down, Mr. Salters refused and ran back through his house and onto the patio.

---

[1] Section 1367(c) provides that the district court may decline to exercise supplemental jurisdiction over claims under § 1367(a) where it has dismissed all claims over which it had original jurisdiction. This court has original jurisdiction only of the federal claim, i.e., that which was brought under § 1983.

2

Officer Trussell moved to a point where he could stay in contact with Mr. Salters and eventually began to talk with him. Mr. Salters remained armed throughout their conversation, and was openly angry and threatening. He repeatedly told Officer Trussell to "be a man," and come into the patio area with him. He also said that he knew Officer Trussell was wearing a bulletproof vest, and so he was going to shoot him in the head.

When Sergeant Barry Pendergraft, the acting shift commander, arrived on the scene, he initiated steps to have a command post established.[2] Sergeant Pendergraft then entered the Salterses' home and removed Mr. Salters' nine year old granddaughter. He then returned to the house and took a position where he could observe Salters, who remained in and around the patio area talking to Officer Trussell.

When the SRT arrived, Sergeant Pendergraft was relieved by SRT Officers Mark Plemons and Larry Shields. Their job was to prevent Mr. Salters from reentering the house and potentially gaining access to more weapons. The officers took up positions in the dining room where they could continue to observe Mr. Salters on the patio area, still talking with Officer Trussell. Soon after they entered the house, however, the officers heard Mr. Salters tell Officer Trussell that he was going back into the house and would shoot any police officers he found there. When Mr. Salters entered the house, Officers Plemons and Shields identified themselves as police officers, and instructed him to stop and put down his weapon. Mr. Salters refused to obey the officers' repeated requests that he lay down

---

[2]Sergeant Pendergraft also called for help from the department's Special Response Team ("SRT") and the Hostage Negotiation Team ("HNT"). The primary responsibility of the SRT was to "contain" a barricaded and armed person in an area where he would not pose a threat to the public, while the HNT was to establish a rapport with barricaded person.

the weapon. Instead, he pointed his pistol directly at Officer Plemons.  Both officers fired their weapons; two shots from Officer Plemons's gun struck Mr. Salters in the chest, killing him.

### III.    **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a

genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party

need not present evidence in a form necessary for admission at trial; however, he may not

merely rest on his pleadings. *Celotex*, 477 U.S. at 324. "[T]he plain language of Rule 56(c)

mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of

proof at trial." *Id.* at 322.

     After the plaintiff has properly responded to a proper motion for summary judgment,

the court must grant the motion if there is no genuine issue of material fact, and the moving

party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law

will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's

function is not himself to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same

standard necessary to direct a verdict: "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v.*

*N.L.R.B.*, 461 U.S. 731, 745 n.11(1983). However, the nonmoving party "must do more than

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted. *Anderson*,

5

477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV.   Discussion

Mrs. Salters contends that the defendants violated Mr. Salters' rights to due process and to be free of unreasonable searches and seizures under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. She asserts that "the Defendants or their officers used 'excessive force' in attempting to apprehend Mr. Salters due to inadequate training in the area of dealing with mentally disturbed and/or suicidal individuals." *Plaintiff's Brief at 8.*

"[A]ll claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989). If a police officer has probable cause to believe that a suspect poses a significant threat of

6

death or serious bodily injury to himself or others, the use of deadly force is reasonable.

*Tennessee v. Garner*, 471 U.S.\_\_, 3 (\_\_\_\_). The Supreme Court has said

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.
>     As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Graham*, 490 U.S. at 396-97 (1989)(citations omitted).

For Fourth Amendment purposes a seizure "requires either physical force . . . or, where that is absent, submission to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *Menuel v. City of Atlanta*, 25 F.3d 990, 994-95 (11th Cir. 1994).[3] In *Menuel*, officers from the Atlanta police department were dispatched to the home of Jessie Menuel in response to a 911 report that she was acting violently. *Menuel*, 25 F.3d at 992. After learning that Ms. Menuel had attacked a member of her family, the officers knocked

---

[3]The plaintiff insists that the appropriate standard to determine when a seizure occurs is the *Mendenhall* test, from Justice Stewart's opinion in *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). That test says "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554. However, in *Hodari D.* the Supreme Court expressly said that the *Mendenhall* test "says a person is seized 'only if,' not that he has been seized 'whenever'; it states a necessary, but not a sufficient, condition for seizure--or, more precisely, for seizure effected through a 'show of authority.'" *Id.* It "establishes that the test for existence of a 'show of authority' is an objective one." *Id.* Accordingly, the court held the *Mendenhall* test is merely a guide to the application of the test used in this opinion.

on the door of the house in an effort to speak with her. *Id.* Catching the officers by surprise, Ms. Menuel burst through the door brandishing a knife and lunged at them. *Id.* When the officers retreated, Ms. Menuel ran back into the house and barricaded herself in one of the bedrooms. *Id.* After trying in vain to coax her out of the room, the officers decided that they would attempt to forcibly capture and arrest her. *Id.* at 993. As they burst through the door of the bedroom, Ms. Menuel shot at them with a .25 caliber handgun. *Id.* The officers returned fire and Ms. Menuel was fatally injured. *Menuel*, 25 F.3d at 992. The Eleventh Circuit applied the *Hodari D.* test to these facts and determined that Ms. Menuel was not seized until the moment she was killed. Specifically, the court held that

> [b]ecause the decedent was intransigent and because she neither yielded to physical force (none was applied to her before the fatal shooting) nor submitted to a display of authority (much of which was applied before the shooting), *Hodari D.* compels the conclusion that no seizure, reasonable or unreasonable, occurred before the shooting. . . . [W]hich is to say, and this court so holds, that until she was shot to death, the decedent was not meaningfully or effectively seized either in the Fourth Amendment sense or in the everyday sense.

*Id.* at 995.

Here too, Mr. Salters never yielded to physical force, nor did he submit to police authority. Instead, he threatened to kill Officer Trussell and other officers in his home, and was subject to police control only after two fatal shots entered his body. Therefore, like the decedent in *Menuel,* Mr. Salters was not "seized" until he was shot.

The court must still determine whether there remains a genuine issue of material fact concerning whether the seizure, once it occurred, was reasonable. The court is convinced there is, in fact, no genuine issue concerning the reasonableness of the seizure. Mr. Salters

8

was armed throughout all of the events in question, and had repeatedly threatened the lives of officers at the scene. Police officers entered the Salterses' home only to contain Mr. Salters on the patio area and to prevent him from gaining access to more weapons. It is undisputed that just before Mr. Salters reentered his home, he told Officer Trussell that he was going back into the house and would shoot any police officers he found there. It is also undisputed that after repeated warnings from Officers Plemons and Shields to stop and put down his weapon, Mr. Salters pointed his gun directly at Officer Plemons. Only then did the officers use deadly force. It was not objectively unreasonable for officers to fire on someone who posed an immediate threat to shoot them with a handgun at close range. Any reasonable officer in the same situation would have feared for his own life or the lives of others, and so the actions of Officers Plemons and Shields were not objectively unreasonable or offensive to the Fourth Amendment. *See Menuel*, 25 F.3d at 997. Therefore, the defendants' motion for summary judgment will be granted by separate order as to all claims under 42 U.S.C. § 1983.

All claims over which this court has original jurisdiction having been dismissed, the court will decline to exercise supplemental jurisdiction of the state wrongful death and loss of consortium claim. No party will be unduly prejudiced by dismissal of the state law claims. Discovery has been completed and, presumably, will be available for use at any trial conducted in the state court. Under § 1367(d), the period of limitations is stayed until thirty (30) days after entry of this order.

Done, this ___8th___ of January, 1997.

Edwin L. Nelson
United States District Judge

10